**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID WHITE, KATHRIN BENDER, | ) | |
| DIANE BOZEMAN, ROY CHERRY, | ) | |
| GARY GILMORE, STEVEN MAXWELL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Cause No.:  1:17-CV-1242 |
| | ) | |
| COVENTRY HEALTH CARE, INC., a | ) | |
| Wholly Owned Subsidiary of Aetna Inc. | ) | |
| | ) | |
| Defendant. | ) | |

**COVENTRY HEALTH CARE, INC. AND AETNA HEALTH HOLDINGS, LLC'S**
**ANSWER TO PLAINTIFFS' COMPLAINT**

Defendant Coventry Health Care, Inc. ("Coventry Health Care") and Aetna Health

Holdings, LLC, as Coventry's successor (for purposes of simplicity, Coventry Health Care and

Aetna Health Holdings, LLC are collectively referred to herein as "Coventry" where

appropriate), by and through their undersigned counsel, for their Answer to Plaintiffs'

Complaint, state as follows:[1]

Common Allegations

A.     Refiling Pursuit to 735 ILCS 5/2-1009 and 735 ILCS 5/13-217

1.      In an order entered on January 19, 2016, by the Honorable John C. Griffin, in the
action known as *David White et al. vs. The City of Chicago and Coventry Health Care, Inc.,* 09
CH 18914 (a case that originated in the Chancery Division but transferred to the Law Division),
Judge Griffin granted plaintiffs' motion for a voluntary dismissal without prejudice, pursuant to
735 ILCS 5/2-1009. Pursuant to 735 ILCS 5/13-217, and Judge Griffin's Order of January 19,
2016, the present action, *Davi*[i]*a White, et al, vs. Coventry Health Care, Inc.,* has been instituted
within one year of the dismissal of 09 CH 18914, and is neither time-barred nor barred by the
doctrine of *res judicata.*

---

[1] Coventry states that it has filed a Motion to Sever or, In the Alternative, Bifurcate in this litigation.  Coventry
believes that severing or, alternatively, bifurcating the Plaintiffs' claims in this litigation is appropriate and
warranted under the applicable law.  Coventry expressly reserves its rights to sever or bifurcate the litigation and
does not waive any such rights through the filing of this Answer.

**ANSWER:** Coventry admits that the action known as *David White et al. vs. The City of Chicago and Coventry Health Care, Inc.,* 09 CH 18914 (a case that originated in the Chancery Division but transferred to the Law Division) was dismissed through an order entered on January 19, 2016. Coventry admits that the present action was filed within one year of the dismissal of 09 CH 18914. Coventry states that the remaining allegations in this Paragraph set forth legal conclusions to which no answer is required and, therefore, Coventry denies such allegations.

      B.     Plaintiffs' Contractual Rights to Have Access to All Medical Care for Duty Related Injuries Unencumbered by Coventry's Medically Unjustified "Not Medically Necessary" Utilization Reviews

2.     During times material to the allegations of this Complaint, each of the six (6) individually named plaintiffs: i) was a career service employee of the City of Chicago ("City"), assigned to the Chicago Fire Department ("CFD"); (b) was a member of a collective bargaining unit consisting of firefighters and paramedics within the CFD, for which Chicago Fire Fighters Union Local No, 2 ("Local 2"), has Served as exclusive bargaining representative; (e) sustained a physical injury during the course of, and while in the performance of his or her duties as a uniformed and active member of the CFD, which injury was recognized by the City and CFD as a duty related injury; (d) was an "essential service employee" within the meaning of § 3 of the Illinois Public Labor Relations Act, 5 ILCS 315/3; and (e) was covered by a collective bargaining agreement ("CBA") between the City and Local No. 2.

**ANSWER:** Coventry states that the allegations in subparagraph (d) of this Paragraph set forth legal conclusions to which no answer is required and, therefore, Coventry denies such allegations. Coventry states that it lacks sufficient information or knowledge regarding the remaining allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

3.     For at least the last 30 years, and during all times material to the allegations of this Complaint, each CBA entered into between the City and Local No. 2 has contained a provision, found in CBA § 7.3, which provides in material part as follows:

> Any member of the Fire Department receiving any injury on duty
> or duty related disability so as to prevent him from attending to his

duties as such member of the Fire Department shall, for the dura-
tion of twelve (12) months, providing his disability shall last that
time . . . shall continue to receive full pay and benefits; and such
disability shall not be considered as rendering necessary his
retirement from service in the Fire Department during such period.

*\*\**

The Employer further agrees to pay **all** hospital and medical costs
of an employee incurring a duty connected injury, illness or
disability. (Emphasis and bold added.)

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding

the allegations contained in this Paragraph in order to verify the truth or falsity of such

allegations and therefore, denies such allegations.  Answering further, Coventry states that what

purports to be a copy of excerpts from a version of the CBA is attached hereto as Exhibit 2.

Coventry states that the CBA, as well as any other versions of the CBA, is the best evidence of

its terms.  Coventry denies the allegations in this Paragraph to the extent that such allegations are

inconsistent with, misstate or otherwise mischaracterize the CBA.


4.      Until on or about May 7, 2013, the defendant, Coventry Health Care, Inc.
("Coventry"), was a publicly traded corporation, incorporated in the State of Delaware, and
doing business within all 50 States, including the State of Illinois. On or about May 7, 2013,
Coventry merged with, and became a wholly owned subsidiary of, Aetna, Inc. ("Aetna"), a
publicly traded corporation, incorporated in the State of Connecticut. The onset of plaintiffs'
claims against Coventry arose before Coventry's merger with Aetna. Both before and since its
merger with Aetna, Coventry has provided services on behalf of public and private employers, to
manage employer costs incurred when their employees sustain on-the-job injuries.

**ANSWER:**  Coventry Health Care, Inc. admits that it was a Delaware corporation until

May 2013.  Coventry Health Care, Inc. admits that it was acquired by Aetna, Inc. and states that

it was merged into Aetna Health Holdings, LLC.  Coventry admits that the onset of Plaintiffs'

claims arose before the merger.  Coventry Health Care, Inc. admits that it provided services on

behalf of public and private employers before the merger.

3

5.      In or about the first half of 2008, the City of Chicago, through the City Council Committee on Finance ("COF"), issued a Request for Proposal ("RFP") seeking the services of an organization to better manage claims of certain City employees whose on-the-job injuries were covered by the Illinois Workers Compensation Act. Among the services the City wanted to enlist from the company or organization that submitted the winning bid to the RFP were: medical bill review, network repricing), utilization review, telephonic case management, field case management, vocational rehab, and pharmacy benefit management (collectively "managed care").

**ANSWER:**  Coventry admits that the City of Chicago issued a Request for Proposal in or

around the first half of 2008 and in which it sought certain services relating to claims.  Coventry

states that the RFP is the best evidence of its terms.  Coventry denies the allegations in this

Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise

mischaracterize RFP.  Coventry denies the remaining allegations in this Paragraph 5.


6.      Coventry was one of approximately a dozen companies to submit a bid to the RFP and in or about August 2008, Coventry's bid was selected by the City as the winning bid. Following its selection as successful bidder, Coventry and the City entered into negotiations to put in place an agreement setting forth the terms of the workers compensation related managed-care undertaking to be provided by Coventry. Coventry Senior Vice President Robert Gelb, assigned to Coventry's office in Downers Grove, Illinois, took the lead on behalf of Coventry in its negotiations with the City. The City's principals in the negotiations over the terms of a managed care agreement were James Cullinan and Ben Brock, Deputy Chief Administrative. Officer and Chief of Information, respectively; with the COE.

**ANSWER:**  Coventry admits that it submitted a bid to the City in connection with the

RFP, that it understands that other bids were submitted to the City in connection with the RFP,

and that it was selected by the City.  Coventry admits that it entered into negotiations with the

City to enter an agreement for the provision of certain services.  Coventry admits that Rob Gelb

was a negotiator for Coventry in the negotiations with the City and that James Cullinan and Ben

Brock were amongst the negotiators for the City.

7.     On or about November 20, 2008, the City and Coventry entered into a Letter Agreement covering services Coventry would be providing to the City for the period from October 1, 2008 through September 30, 2009. (Attached hereto and incorporated herein as Exhibit 1 is a copy of the Letter Agreement) On and after September 30, 2009, and continuing to the present time, Coventry has continued to provide services to the City, which, upon information and belief, is an extension or continuation of the Letter Agreement (Exhibit 1), or is based on terms similar to the Letter Agreement By its terms the Letter Agreement between Coventry and the City "constitutes the entire agreement of the parties regarding the services described."

**ANSWER:**  Coventry admits that what appears to be a copy of the Letter Agreement was attached to the Complaint as Exhibit 1.  Coventry states that the Letter Agreement is the best evidence of its terms.  Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the Letter Agreement.  Coventry admits that it provided services to the City after September 30, 2009.  Coventry denies the remaining allegations in this Paragraph 7.

8.     During times material to the allegations in this Complaint, Coventry touted itself as the market leader in providing managed care solutions for workers' compensation payers. Among the services that Coventry has been providing to the City are those of medical management, utilization review, and health care provider bill review. Coventry's objective in providing these services to the City is to minimize costs to and expenditures by the City in connection with health care and medical treatments for City employees who sustain duty related injuries and are "entitled to benefits under the Workers' Compensation Act."

**ANSWER:**  Coventry admits that it is viewed as a market leader and admits that it provides services to the City that include medical management, utilization review, and health care provider bill review services.  Coventry denies the remaining allegations in this Paragraph 8.

9.     Prior to beginning its work for the City in December 2008, Coventry *knew* that CFD firefighters and paramedics were part of a union, that there was a collective bargaining agreement in effect between the City and said Union, that the firefighters and paramedics were to receive medical care for on-duty injuries paid for by the City, and that CFD firefighter and paramedics were not subject to the Illinois Worker's Compensation Act.

**ANSWER:**  Coventry denies the allegations in this Paragraph 9.

5

10.     Prior to Coventry's beginning its work with the City in December 2008, a CFD firefighter or paramedic who sustained a duty related injury that required any type of specialized medical care and/or treatment, would receive a referral from the Director of the CFD Medical Section to an experienced and Certified specialist, a physician practicing in the field of medicine that provided treatments for the type of injury that the firefighter or paramedic had suffered while performing his/her duties.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

11.     Many duty related injuries that CFD firefighters and paramedics experience involve the musculoskeletal system, and the duty related injuries suffered by the six plaintiffs were musculoskeletal in nature. The care, treatment and repair for injuries to the musculoskeletal system are within the province of orthopedic surgeons.

**ANSWER:**  Coventry admits that orthopedic surgeons are one medical specialty that can be involved in the care and treatment of injuries to the musculoskeletal system.  Coventry denies that orthopedic surgeons are the only medical specialty that provides care for injuries to the musculoskeletal system.  Coventry states that it lacks sufficient information or knowledge regarding the remaining allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

12.     Prior to Coventry's beginning its work with the City in December 2008, the "referral treating physician," *i.e.*, the orthopedic surgeon (or similar medical specialist) to whom the CFD Medical Director had, entrusted the Medical Cure of a CFD firefighter or paramedic who had sustained a duty related injury to the musculoskeletal system, would inform the CFD Medical Director of the anticipated course of treatment or treatment plan for the referred patient *(i.e., the duty-injured CFD firefighter or paramedic).* The CFD Medical Director would, invariably, heed the advice and recommendations prescribed by that specialist treating physician (hereinafter "referral treating physician") related to the Medical Care of the duty-injured firefighter or paramedic and approve the care *(i.e., payment for the care).*

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

13.     Prior to Coventry's beginning its work with the City in December 2008, the advice and recommendations that a referral treating physician prescribed for the care and treatment of a duty-injured firefighter or paramedic, only required the approval of the CFD Medical Director, and did not also have to pass muster of a third party managed care and utilization review organization such as Coventry.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

14.     The City's payments, with respect to its contractual obligation "to pay all hospital and medical costs of an employee incurring a duty connected injury, illness or disability," as provided for in the last paragraph of CBA § 7.3, are derived from City funds that are administered by the Chicago City Council's Committee on Finance ("COF"). Payment of all hospital and medical costs by the COF is dependent upon "a certificate by the chief physician of the department . . . as to the reasonableness of charges made for services rendered." § 3-8-210, Municipal Code of Chicago ("MCC").

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in the first sentence of this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.  Answering further, Coventry states that the CBA is the best evidence of its terms.  Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the CBA.  Coventry states that § 3-8-210 of the Municipal Code of Chicago is the best evidence of its terms.  Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize § 3-8-210 of the Municipal Code of Chicago.  Coventry denies the remaining allegations in Paragraph 14.

15.     Prior to November 20, 2008, the date of the Letter Agreement between the City and Coventry, the COF, as required by MCC §3-8-210, as well as the last paragraph of CBA § 7.3, and CFD General Order 91-015 (quoted in 16 of this Complaint, *infra),* relied on the medical judgment of the CFD's "chief physician," namely, the Medical Director of the CFD Medical Section, as to the reasonableness of charges for Medical Care rendered or to be rendered by a referral treating physician to a duty-injured firefighter or paramedic. And the COF would invariably pay the medical charges accordingly: Not least because of the CFD Medical Director's familiarity with the professional skills and reputations of the physicians who became referral treating physicians, and the Medical Care prescribed by referral treating physicians had been authorized by the CFD Medical Director.

**ANSWER:** Coventry states that MCC § 3-8-210 and CFD Order 91-015 are the best

evidence of their terms. Coventry denies the allegations in this Paragraph to the extent that such

allegations are inconsistent with, misstate or otherwise mischaracterize MCC § 3-8-210 or CFD

Order 91-015. Coventry states that it lacks sufficient information or knowledge regarding the

allegations contained in this Paragraph in order to verify the truth or falsity of such allegations

and therefore, denies such allegations.


16.     During times material to the allegations of this Complaint, CFD General Order 91-015, dealing with "Department Medical Procedure," served to complement the provisions of the last paragraph of CBA § 7.3. Part II § A6 of G.O. 91-015 stated:

> 6. In case of an injury which is attributable to duty, after initial emergency medical treatment, any subsequent medical care must have the approval of the Chicago Fire Department Medical Director to be reimbursable. (Attached hereto as Exhibit 3 are pertinent excerpts of the CFD Order 91-015.)

**ANSWER:** Coventry admits that what appears to be a copy of certain excerpts from

CFD Order 91-015 are attached as Exhibit 3 to the Plaintiffs' Complaint. Coventry states that

CFD Order 91-015 is the best evidence of its terms. Coventry denies the allegations in this

Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise

mischaracterize CFD Order 91-015. Coventry states that it lacks sufficient information or

knowledge regarding the remaining allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

17.     Upon information and belief: in mid-to-late January, 2009 – nearly two months after the City and Coventry entered into the Letter Agreement of November 20, 2008 – the CFD Medical Section learned that Coventry had been selected by COF to provide utilization review services in connection with the Medical Care of duty injured firefighters and paramedics.

**ANSWER:** Coventry admits that the CFD Medical Section was aware that Coventry was providing claims review services in connection with certain medical care.  Coventry states that it lacks sufficient information or knowledge regarding the remaining allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

18.     After learning of Coventry's Utilization Review agreement with the City, the Medical Section began sending inquiries to Coventry in order for Coventry to assess the "medical necessity" of the Medical Care prescribed by referral treating physicians.

**ANSWER**:  Coventry admits that the Medical Section sent requests for Coventry to conduct a review of certain treatments, including a review of the medical necessity of medical care that had been prescribed.  Coventry states that it lacks sufficient information or knowledge regarding the remaining allegations in this Paragraph, including with respect to the Medical Section's knowledge and timing of that knowledge, in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

19.     Coventry's nurses and "associated physicians" then would review medical records, without ever seeing, examining or speaking with a patient, and provide a recommendation as to "medical necessity" to the Medical Section and referral treating physician regarding the referral treating physician's prescribed treatment.

**ANSWER:** Coventry admits that, at certain relevant times, its nurses and "associated physicians" would review medical records and make recommendations as to "medical necessity." Coventry admits that its nurses and "associated physicians" did not see or examine patients.

20. Despite the treatment recommendations of plaintiffs' board certified physician specialists (i.e., the referral treating physicians), Coventry, without appropriate medical justification and outside of the accepted medical standard of care, intentionally made unjustified recommendations that caused the City to breach its obligation under CBA § 7.3, by denying, delaying, curtailing and/or discontinuing Medical Care.

**ANSWER:** Coventry denies the allegations in this Paragraph 20.

21. The City, through CFD Medical Section employees, did not have the expertise of the board certified referral treating physicians to independently assess the determinations made by Coventry associated physician, and therefore relied on the Utilization Review decisions of Coventry in approving or denying Medical Services to the Plaintiffs.

**ANSWER:** Coventry denies the allegations in this Paragraph 21.

22. The City, through its employees in the CFD Medical Section, was intentionally and unjustifiably induced by Coventry into denying and breaching its obligation to provide Medical Services owed to the Plaintiffs in accordance with the CBA, when the City relied on Coventry's medically baseless, dishonest and untrue Utilization Review determinations with regard to the medical necessity of the treatment requested by the Plaintiffs' referral treating physician specialists.

**ANSWER:** Coventry denies the allegations in this Paragraph 22.

23. In the case of the six plaintiffs herein, Coventry issued "not medically necessary" determinations, which were baseless, and below the medical standard of care as prescribed by plaintiffs' referral treating physicians. These "not medically necessary" determinations that Coventry issued on multiple occasions, caused the City to deny approval of Medical Care that plaintiffs' referral treating physicians had recommended – recommendations that were consistent with generally accepted medical standards within the Chicago area medical community. By

10

relying on Coventry's "not medically necessary" determinations caused the City to breach CBA § 7.3, by denying duty-injured firefighters and paramedics Medical Care.

**ANSWER:** Coventry denies the allegations in this Paragraph 23.

24.     To further evidence Plaintiffs' allegations of baseless "not medically necessary" determinations and intentional and unjustified inducement to breach the CBA, upon information and belief, there were approximately 173 occasions during calendar year 2009 when Medical Care prescribed by referral treating physicians for duty injured CFD firefighters and paramedics, were subjected by Coventry to managed care processes and utilization review criteria. Of those 173 Medical Care determination letters that were issued in 2009, Coventry determined that 135 (or 78%) were "not medically necessary."

**ANSWER:** Coventry denies the allegations in this Paragraph 24.

25.     In the years prior to Coventry being engaged by the City to provide utilization review and Managed Care services, duty injured firefighters and paramedics would always receive the Medical Care prescribed by referral treating physicians in keeping with the City's contractual obligation under CBA § 7.3 "to pay all hospital and medical costs of an employee incurring a duty connected injury, illness or disability."

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding

the allegations contained in this Paragraph in order to verify the truth or falsity of such

allegations and therefore, denies such allegations.

26.     Based on the facts stated herein, Plaintiffs allege that Coventry intentionally and unjustifiably induced the City to breach the CBA in order to save the City money and increase its own value to the City. Coventry knew that by issuing "not medically necessary" determinations, the City in turn would not authorize referral treating physicians to provide Medical care to duty-injured firefighters and paramedics, the six plaintiffs included.

**ANSWER:** Coventry denies the allegations in this Paragraph 26.

27.     After the above (and below) cited breaches of the CBA, the City, after significant delays, which caused damages to each of the six Plaintiffs, eventually remedied the breaches by approving requested Medical Services.

11

**ANSWER:** Coventry denies the allegations in this Paragraph 27.

28. Because the breaches were eventually remedied, the six Plaintiffs did not complete the grievance procedure up to and including arbitration, as the only resolution of such a process was to pay for the approved and requested Medical Care. Thus, the administrative process became moot.

**ANSWER:** Coventry denies the allegations in this Paragraph 28.

29. As a result of the breaches of the CBA by the City, induced and caused by Coventry (as described herein), which occurred at the time the City failed to timely approve and provide the requested Medical Services, duty injuries sustained by firefighters and paramedics – the six plaintiffs included – were left to fester, which aggravated and/or failed healthier injuries because the duty-injured firefighters and paramedics were unable to receive the prescribed Medical Care recommended by their referral treating physicians.

**ANSWER:** Coventry denies the allegations in this Paragraph 29.

30. This lack of timely care directly and proximately caused damages to each of the Plaintiffs including lack of proper medical treatment, pain and suffering, loss of a normal life, disability, loss of wages, emotional trauma and other pecuniary damages including loss of career, because without receiving the timely prescribed Medical Care plaintiffs would be and were unable to resume the duties of a firefighter or paramedic.

**ANSWER:** Coventry denies the allegations in this Paragraph 30.

31. The "not medically necessary" determination letters were made by Coventry agents, namely, physicians (at times to be referred to as "Coventry associated physicians") – none of whom were licensed to practice medicine in the State of Illinois – who:

(a) were not always specialists in the same field as the referral treating physician and routinely had "not Medically necessary" determination rates as high as 70% or more;

(b) were assigned by Coventry to appeals related to the duty injuries of CFD firefighters and paramedics whose Medical Care, as prescribed by their referral treating physicians, had already been denied as not medically necessary by a utilization review nurse in Coventry's employ: with the assignment of each Coventry associated physician to a particular appeal purportedly based on a match

12

between the reviewing physician's medical specialty and the type of injury that was the subject of the appeal;

(c) were contracted for the specific purpose of applying Coventry's managed care processes and utilization review criteria so as to render a determination as to the medical necessity of Medical Care that had been prescribed by referral treating physicians of CFD firefighters and paramedics – the six plaintiffs included – who had sustained duty related injuries;

(d) did not, at any time, conduct physical-examinations of, have any discussions with, or make any observations of, duty-injured CFD firefighters and paramedics – the six plaintiffs included – whose Medical Care, in whole or in part, was determined to be not medically necessary by the Coventry associated physician;

(e) allowed each of their respective names to be rubber-stamped on the not medically necessary determination letter(s) pertaining to each plaintiff, with each such letter prepared, upon information and belief, not by the Coventry associated physician whose name is rubber stamped on the letter: rather, upon information and belief, the not medically necessary determination letters were derived and formatted by a non-physician, *viz,* personnel employed by Coventry, who would perfunctorily excerpt language from guidelines, known as Official Disability Guidelines ("ODG"), issued by the Work Loss institute;

(f) ignored and failed to take into account that a referral treating physician's Medical Care advice and recommendations – including those pertaining to the six plaintiffs – were consistent with generally accepted medical standards within the Chicago area medical community;

(g) applied utilization review criteria known as the Official Disability Guidelines ("ODG"), which had not been adopted in Illinois, which were formulated to determine the medical necessity of treatments where an employee's on-the-job injury was covered by a State's Workers Compensation statute, notwithstanding the fact that the duty-related musculoskeletal injuries suffered by CFD firefighters and paramedics, like the six plaintiffs, are not covered by the Illinois Workers Compensation Act, 820 ILCS 30518(c);

(h) were inattentive to: (i) the physical demands placed on CFD firefighters and paramedics, whose duties are rated by the U.S. Department of Labor at the "very. heavy category of work"; (ii) the time constraints – a maximum of 12 months from the date of a duty-related injury – during which the Medical Care prescribed by a referral treating physician would have to be initiated so that by the end of that .12 month period the duty-related injuries could be sufficiently resolved to allow firefighter or paramedic to return to active duty with the CFD.

**ANSWER:** Coventry admits that the physician reviewers were not always in the same specialty as the treating physicians, that the physician reviewers did not conduct physical

13

examinations of the Plaintiffs, and that the ODG was one criteria that was at times considered by the physician reviewers. Coventry denies the remaining allegations in this Paragraph 31.

32.     At various times between on or about June 25, 2008 and on or about April 16, 2009, and continuing thereafter, each of the six plaintiffs sustained, a duty related injury as a CFD uniformed employee, holding one of the firefighter ranks within the CFD's Division of Fire Suppression & Rescue or holding one of the paramedic ranks in the Division of Emergency Medical Services.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

33.     Shortly after each plaintiff sustained a duty-related injury, and after a review of hospital and medical records relating to each plaintiff's duty related injury, Dr. Russell, the internist and longtime Director of the CFD Medical Section, provided each of the six named plaintiffs with the name of a Chicago area referral treating physician. Each referral treating physician was licensed to practice medicine in the State of Illinois, and each referral treating physician specialized in orthopedic surgery, and had board certifications, including certifications by the American Board of Orthopedic Surgery.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

C.      Duty Related Injuries Suffered by the Six Plaintiffs: Medically Necessary Care and Treatment Prescribed by CFD Approved Treating Physicians: Coventry's Unjustified Recommendations Caused the City.to Breach its Contractual Obligations to the Plaintiffs, by Denying, Delaying, Curtailing and/or Discontinuing Medically Necessary Treatments:

(i) Plaintiff David White: ¶¶ 34-47

34.     The Plaintiff, David White, became employed by the City of Chicago on November 1, 2002, when he was assigned as an active member of the CFD holding the rank of Firefighter. On or about April 16, 2009, while on duty, and as he was performing the duties

required of him as a member of CFD Hazardous Material Company 5-1-2, White sustained an injury to his right arm and shoulder.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

35.     As a result of the injuries he suffered on the job as a firefighter, the CFD Medical Section referred Firefighter White to Dr. Mark R. Nikkel, a board certified Chicago area orthopedic surgeon, who, after conducting various tests, including an MRI arthrogram, determined that arthroscopic surgery was medically necessary to repair what Dr. Nikkel had diagnosed as a "SLAP" tear, SLAP being the acronym for "Superior Labrum, from Anterior to Posterior."

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

36.     On or about May 1, 2009, Dr. Nikkel submitted a request to Coventry for prior approval of the six surgical procedures that Dr. Nikkel deemed necessary to repair the shoulder and arm injuries that White had sustained.

**ANSWER:** Coventry admits that on or about May 1, 2009, a request was submitted to Coventry for a review in connection with certain surgical procedures that Dr. Nikkel intended to perform on Mr. White.  Coventry denies the remaining allegations that are contained in this Paragraph 36.

37.     By letter dated May 26, 2009 — which a Coventry associated physician directed not to Dr. Nikkel but to Elise Horton, a CFD Medical Section employee – Coventry determined that none of the six surgical procedures were medically necessary because "[t]he proposed treatment plan is not consistent with our clinical review criteria." (Attached hereto, and incorporated herein as Exhibit 4, is Coventry's denial letter of 5/26/09.)

15

**ANSWER:** Coventry admits that what appears to be a copy of the May 26, 2009 letter is attached as Exhibit 4 to the Plaintiffs' Complaint. Coventry states that the May 26, 2009 letter is the best evidence of its terms. Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the May 26, 2009 letter. Coventry denies any implication of wrongdoing related to Exhibit 4. Coventry denies any implication that it denied any treatment for Mr. White. Coventry denies the remaining allegations that are contained in this Paragraph 37.

38.     On May 27, 2009, Dr. Nikkel filed an appeal of Coventry's determination that the proposed surgery was "not medically necessary." Responding to Coventry's suggestion, in its denial letter of May 26 (Ex, 4 that White be treated "conservatively" for the next 3 months, Dr. Nikkel opined that a delay of the surgery would only "worsen" White's condition and "further delay" his ability to return to work "and perform the critical demands of a Chicago fire fighter." (Attached hereto, and incorporated herein as Exhibit 5, is Dr. Nikkel's appeal letter of 5/27/09.)

**ANSWER:** Coventry admits that what appears to be a copy of the May 27, 2009 letter from Dr. Nikkel is attached as Exhibit 5 to the Plaintiffs' Complaint. Coventry states that the May 27, 2009 letter is the best evidence of its terms. Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the May 27, 2009 letter. Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the May 26, 2009 letter that was attached as Exhibit 4 to Plaintiffs' Complaint. Coventry denies any implication of wrongdoing related to Exhibits 4 or 5. Coventry denies any implication that it denied any treatment for Mr. White. Coventry denies the remaining allegations in this Paragraph 38.

39.     As a result of filing the original lawsuit on June 12, 2009 (*viz., David White, et al. vs. The City of Chicago and Coventry Health Care, Inc.,* 09 CH 18914: *see* ¶ 1 of this

Complaint), the City eventually arranged for an Independent Medical Examination (IME) of White; the results of this IME confirmed Dr. Nikkel's earlier determination that surgery was medically necessary to repair the rotator cuff and other injuries White had suffered.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

40.     On July 17, 2009, after a *two and a half month breach* by the City in approving the surgery, based on the medically unjustified-and improper recommendation of Coventry, Dr. Nikkel performed surgery, finding that his pre-operative diagnosis proved correct.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph relating to the date, performance, or findings of the alleged surgery in order to verify the truth or falsity of such allegations and therefore, denies such allegations. Coventry denies the remaining allegations in this Paragraph 40.

41.     Following surgery, Dr. Nikkel advised White that he would need an extensive period of physical therapy ("PT"), of up to 9 months in duration. However, after just 3 months of PT, Coventry, by letter dated November 20, 2009, explained that it had discontinued further PT, because it was "not consistent with our clinical review criteria." (Attached hereto, and incorporated herein as Exhibit 6, is Coventry's denial letter of 11/20/09.) In his patient notes of December 2, 2009, Dr. Nikkel observed that Coventry's "failure to adhere to rehab protocol will result in a delayed recovery if not a complete recovery for this patient." (Attached hereto, and incorporated herein, as Exhibit 7, are Dr. Nikkel's notes of 12/2/09.)

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in the first sentence of this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations. Coventry admits that what appears to be a copy of the November 20, 2009 letter is attached as Exhibit 6 to the Plaintiffs' Complaint. Coventry states that the November 20, 2009 letter is the best evidence of its terms. Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with,

17

misstate or otherwise mischaracterize the November 20, 2009 letter. Coventry denies that it

discontinued or denied Mr. White's PT. Coventry admits that what appears to be a copy of

certain December 2, 2009 notes is attached as Exhibit 7 to the Plaintiffs' Complaint. Coventry

states that the December 2, 2009 notes are the best evidence of their terms. Coventry denies the

allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or

otherwise mischaracterize the December 2, 2009 notes. Coventry denies any implication of

wrongdoing on the part of Coventry in connection with Exhibits 6 or 7. Coventry denies the

remaining allegations in this Paragraph 41.


42.     The intentional and medically unjustified cessation of PT for over 5 months
worsened the condition of White's right shoulder and arm which, had PT not been discontinued
by Coventry, could have been alleviated.

**ANSWER:**  Coventry denies the allegations in this Paragraph 42.


43.     Consequently, Dr. Nikkel had to perform additional surgery on April 2, 2010.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding

the allegations that Mr. White had surgery on April 2, 2010 in order to verify the truth or falsity

of such allegations and therefore, denies such allegations. Coventry denies the remaining

allegations in this Paragraph 43.


44.     Coventry's baseless and intentionally unjustified recommendations to the City
that prescribed treatment was not medically necessary, caused the City to breach its contract by
denying, delaying, curtailing, discontinuing and/or deferring the treatment Dr. Nikkel prescribed,
including surgery and PT, which caused and/or contributed to the worsening and deterioration of
White's condition, which, in Dr. Nikkel's opinion, made it doubtful that White would ever be
able to perform the demanding duties of a CFD Firefighter. (Attached hereto, and incorporated
herein as Exhibit 8, is a Memorandum from Dr. Nikkel dated 11/8/10.)

**ANSWER:** Coventry denies that it engaged in any baseless or intentionally unjustified conduct, denies that it made baseless and intentionally unjustified recommendations to the City, and further denies that it caused the City to breach its contract. Coventry denies that it caused or contributed to the worsening of Mr. White's condition. Coventry admits that what appears to be a copy of a November 8, 2010 document from Dr. Nikkel is attached as Exhibit 8 to Plaintiffs' Complaint. Coventry states that the November 8, 2010 document is the best evidence of its terms. Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the November 8, 2010 document. Coventry denies the remaining allegations in this Paragraph 44.

45.     The Medical Care prescribed by Dr. Nikkel, as White's referral treating physician, was consistent with generally accepted medical standards within the Chicago area medical community.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

46.     On or about April 16, 2010, White had exhausted his one year paid medical lay-up time (a/k/a sick leave), but, as Dr. Nikkel had earlier predicted, because Coventry had denied or delayed medically necessary treatment, White was still physically incapable of returning to work. Consequently, White lost his job as a firefighter and applied for a duty disability benefit with the Firemen's Annuity and Benefit Fund of Chicago ("FABF"), The FABF has since awarded White, who turned 42 years of age on December 28, 2010, a duty disability benefit pursuant to § 6-151 of the Illinois Pension Code, 40 ILCS 5/6-151.

**ANSWER:** Coventry denies that it denied or delayed medically necessary treatment, or any treatment, for Mr. White. Coventry states that it lacks sufficient information or knowledge regarding the remaining allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

47.     White's inability to return to work. is a direct and proximate result of the baseless and unjustified "not medically necessary determinations" which intentionally induced the City to breach its contract by denying, delaying, curtailing, discontinuing and/or deferring Medical Care, causing White to incur damages in the form of lost wages, compensation and benefits. White has also experienced pain, suffering, emotional trauma, loss of a normal life, disability, anguish, anxiety, worry, indignity, embarrassment, apprehension, aggravation, and he has undergone an ordeal over and above that which he would otherwise have experienced from the original duty related injury he sustained on or about April 16, 2009. Plaintiff David White's damages exceed $50,000.00.

**ANSWER:**  Coventry denies the allegations in this Paragraph 47.


(ii) Plaintiff Kathrin Bender: ¶¶ 48-61

48.     Plaintiff Kathrin Bender ("Bender"), became employed by the City of Chicago on or about on March 16, 1995, when she was assigned as an active member of the CFD within the Emergency Medical Services Division, holding the rank of Paramedic, and she was subsequently promoted to the rank of Paramedic-in-Charge.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.


49.     On or about June 25, 2008, Bender sustained a duty related injury when she fell off a ladder.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.


50.     The CFD Medical Section referred Paramedic-in-Charge Bender to Dr. John Fernandez, a board certified orthopedic surgeon. As prescribed by Dr. Fernandez, and as approved by the CFD Medical Section, Bender underwent conservative treatment, which included 3 sessions per week of PT, between July 3, 2008 and November 24, 2008, but neither PT nor a cortisone injection alleviated her pain or allowed Bender to regain functional use of her

left hand and arm. An MRI performed on November 11, 2008, revealed a tear to the triangular fibrocartilage complex (MCC) of the left wrist, On January 26, 2009, and with the approval of the CFD Medical Section, Dr. Fernandez performed arthroscopic surgery to repair the TFCC left wrist tear.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

51.     The PT sessions that Bender attended between July 3, 2008, and November 24, 2008, were approved by Dr. Russell, the CFD's Medical Director, and did not require Coventry's approval or authorization as these PT treatments occurred prior to Coventry's involvement with the City.

**ANSWER:** Coventry denies that the full range of PT treatments that are referenced in this Paragraph occurred prior to Coventry's involvement with the City.  Coventry denies any implication that the City was obligated to obtain Coventry's approval or authorization as to medical treatments.  Coventry states that it lacks sufficient information or knowledge regarding the remaining allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

52.     Following the surgery performed on January 26, 2009, Dr. Fernandez prescribed that Bender receive 18 sessions of post-operative occupational therapy (hereinafter "OT").

**ANSWER:** Coventry admits that Dr. Fernandez prescribed OT to Ms. Bender after January 26, 2009.  Coventry states that it lacks sufficient information or knowledge regarding the remaining allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

53.     However, by letter dated April 20, 2009 – which a Coventry associated physician directed not to Dr. Fernandez but to Sylvia Tienda, a CFD Medical Section employee – Coventry

determined that additional OT "exceed[ed] recommended visits as per state guidelines," Instead, Coventry modified the OT request to "9 additional PT visits," (Attached hereto, and incorporated herein as Exhibit 9, is Coventry's 4/20/09 letter).

**ANSWER:**  Coventry admits that what appears to be a copy of the April 20, 2009 letter is attached as Exhibit 9 to the Plaintiffs' Complaint.  Coventry states that the April 20, 2009 letter is the best evidence of its terms.  Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the April 20, 2009 letter.  Coventry denies any implication of wrongdoing related to Exhibit 9.  Coventry denies that it denied or modified the care that was to be provided to Ms. Bender.  Coventry denies the remaining allegations in Paragraph 53.


54.     When Dr. Fernandez renewed his request for 18 OT sessions, Coventry, by letter dated June 4, 2009 – which Coventry once more directed to CFD Medical Section employee Tienda, but not to Dr. Fernandez – determined that those OT sessions were not medically necessary because Dr. Fernandez's recommendation did not fit within "overall physical therapy philosophies," including "ODG criteria" [Official Disability Guidelines]. (Attached hereto, and incorporated herein as Exhibit 10, is Coventry's 6/4/09 denial letter.)

**ANSWER:**  Coventry admits that what appears to be a copy of the June 4, 2009 letter is attached as Exhibit 10 to the Plaintiffs' Complaint.  Coventry states that the June 4, 2009 letter is the best evidence of its terms.  Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the June 4, 2009 letter.  Coventry denies any implication of wrongdoing related to Exhibit 10.  Coventry denies that it denied or modified the care that was to be provided to Ms. Bender.  Coventry denies the remaining allegations in Paragraph 54.


55.     On or about August 2010, Dr. Fernandez advised Bender that because of the time that had elapsed since Coventry's denial and curtailment of PT and OT, a resumption of PT would not be effective, and that she either had to live with the pain or have further surgery.

22

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

56.     Dr. Fernandez scheduled a second surgical procedure for on or about August 23, 2010, but when Coventry had not responded to Dr. Fernandez's authorization request, the second surgery was re-scheduled for September 20, 2010, by which time Coventry had denied that second surgical procedure.

**ANSWER:** Coventry denies the allegation in Paragraph 56 that it denied the second surgical procedure, and denies that it denied or modified any surgical procedures or treatments for Ms. Bender.  Coventry states that it lacks sufficient information or knowledge regarding the remaining allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

57.     On or about June 26, 2009, Bender was medically unable to return to work with the CFD because Coventry had without medical justification induced the City to breach CBA § 7.3 by the denial, delay, curtailment, discontinuation and/or deferral of medically necessary treatment.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge as to whether Ms. Bender was medically unable to return to work on or about June 26, 2009 in order to verify the truth or falsity of such allegations and therefore, denies such allegations.  Coventry denies the remaining allegations in this Paragraph 57.

58.     On or about June 26, 2009, Bender exhausted her one year paid medical lay-up time (a/k/a sick leave), as provided for in CBA § 7.3.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

59.

**ANSWER:** Coventry states that Plaintiffs failed to include any allegations as Paragraph 59 of their Complaint. To the extent that any response is still required in connection with Paragraph 59, Coventry denies Paragraph 59.

60. The Medical Care prescribed by Dr. Fernandez, as Bender's referral treating physician, was consistent with generally accepted medical standards within the Chicago area medical community.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

61. Bender's inability to return to work is a direct and proximate result of Coventry's tortious interference with the contractual rights conferred by § 7.3 of the CBA (as more fully alleged in Counts I, II and III of this Complaint), causing Bender to incur damages in the form of lost wages, compensation and benefits. Moreover, Bender has also experienced pain, suffering, emotional trauma, loss of a normal life, disability, anguish, anxiety, worry, indignity, embarrassment, apprehension, aggravation, and she has undergone an ordeal over and above that which she would otherwise have experienced from the original duty related injury she sustained on or about June 25, 2008. Plaintiff Kathrin Bender's damages exceed $50,000.00.

**ANSWER:** Coventry denies the allegations in this Paragraph 61.

(iii) Plaintiff Diane Bozeman: ¶¶ 62-

62. Plaintiff Diane Bozeman became- employed by the City of Chicago on or about October 1, 1991, and was an active member of the CFD's Division of Fire Suppression and Rescue, holding the rank of Firefighter.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

63. On or about September 23, 2008, Bozeman sustained duty related injuries, when, during the performance of her duties as a CFD Fire Inspector, the vehicle she was driving was hit by a truck, causing Bozeman to sustain injuries to her neck, shoulder and back.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

64. Shortly thereafter, the CFD Medical Section referred Firefighter Bozeman to Dr. Richard Lim, a board certified orthopedic surgeon, who recommended that Bozeman receive an epidural steroid injection.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

65. Coventry, through Dr. Andrew Sebby, who is not board certified in orthopedic surgery physician, and who does not practice medicine, initially denied the recommendation by Dr. Lim that Bozeman receive a cervical epidural steroid injection. Subsequently, after a delay, Coventry changed its recommendation regarding said injection, which was administered on or about February 12, 2009.

**ANSWER:** Coventry denies the allegation that it denied any services in connection with Ms. Bozeman, denies that it denied a cervical epidural steroid injection, and denies that it denied any services that were recommended by Dr. Lim. Coventry admits that it recommended

approval of a cervical epidural steroid injection by Dr. Lim.  Coventry denies the remaining

allegations in this Paragraph 65.

66.     On or about May 27, 2009, Dr. Lim, learned that Dr. Sebby had again denied
Medical Treatment that Dr. Lim, as Bozeman's referral treating physician, had prescribed. Dr.
Lim initiated a telephone conversation with Dr. Sebby. When Sebby told Dr. Lim that he would
authorize no more than four PT sessions for Bozeman; Dr. Lim voiced his disapproval, with Dr.
Lim informing Dr. Sebby that Sebby had "not seen . . . not evaluated . . . and . . . not laid hands
on the patient [Bozeman]." (Attached hereto, and incorporated herein as Exhibit 11, is Dr. Lim's
patient notes of 5/27/09.)

**ANSWER:**  Coventry denies the allegation that Dr. Sebby denied medical treatment that

Dr. Lim had prescribed.  Coventry admits that Dr. Lim and Dr. Sebby spoke by telephone.

Coventry admits that what purports to be a copy of May 27, 2009 notes is attached as Exhibit 11

to the Plaintiffs' Complaint.  Coventry states that the May 27, 2009 notes are the best evidence

of their terms.  Coventry denies the allegations in this Paragraph to the extent that such

allegations are inconsistent with, misstate or otherwise mischaracterize the May 27, 2009 notes.

Coventry denies that Dr. Lim's notes are accurate or correct, and Coventry denies the statements

contained in Dr. Lim's notes to the extent that such statements do not accurately reflect the

nature of the telephone conversation between Dr. Sebby and Dr. Lim.   Coventry denies any

implication of wrongdoing related to Exhibit 11.  Coventry denies the remaining allegations in

Paragraph 66.

67.     By letter dated May 28, 2009 – which Coventry directed not to Dr. Lim but to
Sylvia Tienda of the CM Medical Section– Coventry (through Dr. Sebby) denied the additional
PT prescribed by Dr. Lim, determining that the PT was not medically necessary because it did
not fit within "over-all physical therapy philosophies," including "ODG" PT guidelines.
(Attached hereto, and incorporated herein, as Exhibit 12 is Coventry's denial of 5/28/09.)

**ANSWER**:  Coventry denies that it denied additional PT prescribed by Dr. Lim.

Coventry admits that what appears to be a copy of the May 28, 2009 letter is attached as Exhibit

12 to the Plaintiffs' Complaint. Coventry states that the May 28, 2009 letter is the best evidence

of its terms. Coventry denies the allegations in this Paragraph to the extent that such allegations

are inconsistent with, misstate or otherwise mischaracterize the May 28, 2009 letter. Coventry

denies any implication of wrongdoing related to Exhibit 12. Coventry denies the remaining

allegations in Paragraph 67.

68.    Because of Coventry's baseless and medically unjustified recommendations that
the PT treatment prescribed by Bozeman's referral treating physician was "not medically
necessary, caused the City to breach its contract by denying, delaying, curtailing, discontinuing
and/or deferring of PT, Without the prescribed PT, Bozeman was prevented from recovering
from her injuries, and left Bozeman as not medically or physically able to return to active duty
with the CFD by the time she had exhausted her one year paid medical lay-up time on September
23, 2009, Thereafter, Bozeman lost her position as a paramedic and applied for a duty disability
benefit with the FABF, and the FABF awarded her that benefit.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding

the allegations in the last sentence of this Paragraph in order to verify the truth or falsity of such

allegations and therefore, denies such allegations. Coventry denies the remaining allegations in

this Paragraph 68.

69.    The Medical Care prescribed by Dr. Lim, as Bozeman's referral treating
physician, was consistent with generally accepted medical standards within the Chicago area
medical community.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.

70.    Bozeman's inability to return to work is a direct and proximate result of
Coventry's tortious interference with the contractual rights conferred by § 7.3 of the CBA (as
more fully alleged in Counts I, II and III of this Complaint), causing Bozeman to incur damages
in the form of lost wages, compensation and benefits. Bozeman has also experienced pain,

suffering, emotional trauma, loss of a normal life, disability, anguish, anxiety, worry, indignity, embarrassment, apprehension, aggravation, and she has undergone an ordeal over and above that which she would otherwise have experienced from the original duty related injury she sustained on or about September 23, 2008. Plaintiff Diana Bozeman's damages exceed $50,000.00.

**ANSWER:** Coventry denies the allegations in this Paragraph 70.


(iv) <u>Plaintiff Roy Cherry: ¶¶ 71-80</u>

71.     Plaintiff Roy Cherry became employed by the City of Chicago on or about November 1, 1989, when he was assigned as an active member of the CFD's Division of Fire Suppression and Rescue, holding the rank of Firefighter.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.


72.     On or about April 11, 2009, as Cherry was dragging a fire hose to connect to a fire engine's water tank at the scene of a structural fire, a vehicle drove over the hose, forcefully pulling the hose out of Cherry's hands, and causing Cherry to sustain an injury to his left shoulder.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.


73.     The CFD Medical Section referred Firefighter Cherry to Dr. Jose Perez-Sanz, a board certified orthopedic surgeon. Dr. Perez-Sanz prescribed a PT regimen of several months in duration for Firefighter Cherry.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.

74.     After approximately one month of PT, and in a letter dated May 27, 2009, from Coventry physician Dr. Sebby, Coventry discontinued further PT for Cherry. Coventry's denial of further PT for Cherry was directed by Dr. Sebby to Sylvia Tienda an employee in the CFD Medical Section; Coventry did not provide a copy of Dr. Sebby's letter to Dr. Perez-Sanz. (Attached hereto, and incorporated herein as Exhibit 13, is Coventry's denial of 5/27/09.) Coventry discontinued further PT for Cherry on the grounds that it did not fit within "overall physical therapy philosophies," Including ODG guidelines.

**ANSWER:**  Coventry denies that it discontinued or denied further, or any, PT for Mr. Cherry.  Coventry admits that what appears to be a copy of the May 27, 2009 letter is attached as Exhibit 13 to the Plaintiffs' Complaint.  Coventry states that the May 27, 2009 letter is the best evidence of its terms.  Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the May 27, 2009 letter. Coventry denies any implication of wrongdoing related to Exhibit 13.  Coventry denies the remaining allegations in Paragraph 74.

75.     For approximately the next 6 months, Cherry received no medical treatment or PT, except a small and insufficient amount that he was able to pay for out of his own pocket.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

76.     The Medical Care prescribed by Dr. Perez-Sanz, as Cherry's referral treating physician, was consistent with generally accepted medical standard's within the Chicago area medical community.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

77.     On or about late 2009, or early 2010, Cherry took a Functional Capacity Evaluation ("FCE"), which was required before he could return to active duty with the CFD; Cherry, however, was unable to pass the FCE.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

78.     On or about March 9, 2010, Cherry was approved for surgery to repair his torn rotator cuff.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

79.     Due to the extended period when he received no treatment for his shoulder injury – as a result of 'Coventry's medically unjustified curtailment and discontinuation of any more than one month of PT – Cherry was neither physically nor medically able to return to active duty with the CFD by the time his one year paid medical layup was exhausted, on April 11, 2010. Thereafter, Cherry applied for, and was awarded, a duty disability pension, from the Firemen's Annuity and Benefit Fund of Chicago.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding the allegations in the last sentence of this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.  Coventry denies the remaining allegations in this Paragraph 79.

80.     Cherry's inability to return to work is a direct and proximate result of Coventry's tortious interference with the contractual rights conferred by § 7.3 of the CBA (as more fully alleged in Counts I, II and III of this Complaint), causing Cherry to incur damages in the form of lost wages, compensation and benefits. Cherry has also experienced pain, suffering, emotional trauma, loss of a normal life, disability, anguish, anxiety, worry, indignity, embarrassment, apprehension, aggravation, and he has undergone an ordeal over and above that which he would

otherwise have experienced from the original duty related injury he sustained on or about April 11, 2009. Plaintiff Roy Cherry's damages exceed $50,000.00.

**ANSWER:** Coventry denies the allegations in this Paragraph 80.

(v) <u>Plaintiff Gary Gilmore ¶¶ 81-90</u>

81.     Plaintiff Gary Gilmore became employed by the City of Chicago on or about February 16, 1985, becoming an active member of the CFD's Division of Fire Suppression and Rescue, with the rank of Firefighter.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.

82.     On or about January 14, 2009, Gilmore was on duty at the scene of a fire, and as he was advancing a charged hose to combat the flames, he stepped into a snow covered hole, causing him to fall on his left side, twisting his hip in the process, and sustained a duty related injury to his hip.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph, including in the footnote to this Paragraph, in order to verify the

truth or falsity of such allegations and therefore, denies such allegations.

83.     The CFD Medical Section referred Firefighter Gilmore for treatment for his hip injury to Dr. Kathleen Weber a board certified orthopedic physician at Rush University Medical Center, who prescribed conservative treatment including PT and cortisone injections.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.

84.     When conservative treatment showed no marked improvement, the Medical Section referred Gilmore to one of Dr. Weber's colleagues at Rush, Dr. Craig Della Vale, another board certified orthopedic surgeon.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.

85.     Firefighter Gilmore's initial examination by Dr. Della Valle was on June 16, 2009, after which Dr. Della Valle informed Gilmore that he was in need of left hip resurfacing and total hip replacement.

**ANSWER:**  Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.

86.     By letter dated June 24, 2009, Coventry, through Dr. David Gordon, a Coventry associated physician, with a practice in Easton, Pennsylvania, denied Dr. Della Valle's request to proceed with hip replacement surgery. The surgery denial letter from Coventry, via Dr. Gordon, who is not a board certified orthopedic surgeon, was directed by Coventry not to Gilmore's referral treating physician, Dr. Della Valle, but to Ms. Tienda of the Medical Section.

**ANSWER:**  Coventry denies that it denied Dr. Della Valle's request to proceed with hip

replacement surgery.  Coventry states that the June 24, 2009 letter is the best evidence of its

terms.  Coventry denies the allegations in this Paragraph to the extent that such allegations are

inconsistent with, misstate or otherwise mischaracterize the June 24, 2009 letter.  Coventry

denies any implication of wrongdoing related to the June 24, 2009 letter.  Coventry denies the

remaining allegations in Paragraph 86.

87.     Coventry adopted Dr. Gordon's medically unjustified determination that hip replacement surgery was not medically necessary for Firefighter Gilmore notwithstanding the fact that Gilmore satisfied the Coventry criteria for hip replacement surgery-as cited in

Coventry's denial. (Attached hereto, and incorporated herein as Exhibit 14, is Coventry's denial of 6/24/09.)

**ANSWER:** Coventry admits that what appears to be a copy of the June 24, 2009 letter is attached as Exhibit 14 to the Plaintiffs' Complaint. Coventry states that the June 24, 2009 letter is the best evidence of its terms. Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the June 24, 2009 letter. Coventry denies any implication of wrongdoing related to Exhibit 14. Coventry denies the remaining allegations in Paragraph 87.

88.     The Medical Care prescribed by Dr. Della Valle, as Gilmore's referral treating physician, was consistent with generally accepted medical standards within the Chicago area medical community.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

89.     Because the hip replacement surgery recommended by Dr. Della Valle was disapproved by Coventry, by the time Gilmore's one year paid medical layup was exhausted, on January 14, 2010, he was neither physically nor medically able to return to active duty with the CFD. Thereafter, Gilmore applied for, and was awarded, a duty disability pension from the Firemen's Annuity and Benefit Fund of Chicago.

**ANSWER:** Coventry denies that it disapproved or denied any hip replacement surgery that was recommended for Mr. Gilmore. Coventry states that it lacks sufficient information or knowledge regarding the remaining allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

90.     Gilmore's inability to return to work is a direct and proximate result of Coventry's tortious interference with the contractual rights conferred by § 7.3 of the CBA (as

33

more fully alleged in Counts I, II and III of this Complaint), causing Gilmore to incur damages in the form of lost wages, compensation and benefits. Moreover, Gilmore has also experienced pain, suffering, loss of a normal life, emotional trauma, disability, anguish, anxiety, worry, indignity, embarrassment, apprehension, aggravation, and he has undergone an ordeal over and above that which he would otherwise have experienced from the original duty related injury he sustained on or about January 14, 2009, Plaintiff Gary Gilmore's damages exceed $50,000.00.

**ANSWER:** Coventry denies the allegations in this Paragraph 90.

### (vi) Plaintiff Steven Maxwell ¶¶ 91-107

91.     Plaintiff Steven Maxwell became employed by the City of Chicago on or about February 19, 1980, when he was assigned as an active member of the CFD's Division of Fire Suppression and Rescue, holding the rank of Firefighter.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

92.     On or about December 12, 2008, Maxwell, holding the rank of 'Engineer/EMT, while on duty, was assisting a CFD ambulance crew that had been dispatched to a medical emergency. As he was ascending a flight of stairs Maxwell slipped and fell backwards onto a concrete landing sustaining injuries to his neck.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

93.     The CFD Medical Director (Dr. Russell) referred Engineer Maxwell to Dr. Robert Semba, a board certified orthopedic surgeon, to provide Medical Care for the injuries Maxwell sustained on December 12, 2008, which included a herniated disc at C 6-7, disc protrusion at C 5-6, and neural foraminal stenosis at C 3-4.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

94.     The CFD Medical Director also authorized Maxwell to receive facet joint injections from Dr. Neeraj Jain, a board certified anesthesiologist and a specialist in treating pain.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

95.     By letter dated February 16, 2009, Coventry, through Dr. Andrew Sebby, without appropriate medical justification, determined that the facet joint injections that Dr. Jain pre-scribed for Maxwell – with the concurrence of Dr. Semba and with the approval of CFD Medical Director Russell – were not medically necessary because Dr. Jain failed to document 12 criteria whose presence is required by Official Disability Guidelines. (Attached hereto, and incorporated herein as Exhibit 15, is Coventry's denial of 2/16/2009)

**ANSWER:** Coventry admits that what appears to be a copy of the February 16, 2009 letter is attached as Exhibit 15 to the Plaintiffs' Complaint. Coventry states that the February 16, 2009 letter is the best evidence of its terms. Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the February 16, 2009 letter. Coventry denies any implication of wrongdoing related to Exhibit 15. Coventry denies any implication that it denied any services that were prescribed for Mr. Maxwell. Coventry denies the remaining allegations in Paragraph 95.

96.     After Dr. Sebby, on Coventry's behalf, denied authorization for Dr. Jain to administer facet joint injections, the CFD Medical Section approved a referral of Engineer Maxwell to be seen by Dr. Anis Mekhail, one of Dr. Semba's colleagues at Parkview Musculoskeletal Institute.

**ANSWER:** Coventry denies that Dr. Sebby, on Coventry's behalf or individually, denied authorization for Dr. Jain to administer facet joint injections. Coventry states that it lacks sufficient information or knowledge regarding the remaining allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

97. Dr. Mekhail, a board certified orthopedic surgeon, recommended disc replacement surgery.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

98. By letter dated April 28, 2009, Coventry, by Dr. Robert Waltrip, an orthopedic physician from Pittsburgh, would not certify the disc replacement surgery prescribed by Dr. Mekhail, and in a letter to Ms. Tienda (not to Dr. Mekhail), Dr. Waltrip gave his reasons, as a Coventry associated physician, for denying disc replacement surgery (Attached hereto, and incorporated herein as Exhibit 16, is Coventry's denial of 4/28/2009.)

**ANSWER:** Coventry denies that it denied a disc replacement surgery for Mr. Maxwell and denies that it denied any treatment for Mr. Maxwell. Coventry admits that what appears to be a copy of the April 28, 2009 letter is attached as Exhibit 16 to the Plaintiffs' Complaint. Coventry states that the April 28, 2009 letter is the best evidence of its terms. Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the April 28, 2009 letter. Coventry denies any implication of wrongdoing related to Exhibit 16. Coventry denies the remaining allegations in Paragraph 98.

99. In mid-August 2009, Dr. Mekhail resubmitted a request to have Coventry approve disc replacement surgery.

36

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

100.

**ANSWER:** Coventry states that Plaintiffs failed to include any allegations as Paragraph 100 of their Complaint. To the extent that any response is still required in connection with Paragraph 100, Coventry denies Paragraph 100.

101. By letter dated September 11, 2009, Coventry, by Dr. Joshua Szabo, an orthopedic physician from Butler, Pennsylvania, repeated nearly verbatim the not medically necessary letter from Dr. Waltrip (Exhibit 16), (Attached hereto, and incorporated herein as Exhibit 17, is Coventry's denial of 9/11/2009.)

**ANSWER:** Coventry admits that what appears to be a copy of the September 11, 2009 letter is attached as Exhibit 17 to the Plaintiffs' Complaint. Coventry states that the September 11, 2009 letter is the best evidence of its terms. Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate or otherwise mischaracterize the September 11, 2009 letter. Coventry denies any implication of wrongdoing related to Exhibit 17. Coventry denies the remaining allegations in Paragraph 101.

102. Further, Coventry without appropriate medical justification failed to reconsider the earlier denials after Dr. Mikhail alerted Coventry that the disc replacement surgery he prescribed had won FDA approval.

**ANSWER:** Coventry denies the allegations in this Paragraph 102.

103. Following its second refusal to approve the disc replacement surgery prescribed by Drs. Mikhail and Semba (Exhibit 17), approximately 3 weeks later, on or about October 5,

2009, Coventry gave its approval to Dr. Jain to do the facet join injections to C 3-C 4 through C 6-C 7 – the same procedure that Coventry had not approved 8 months earlier. *(See,* Exhibit 15.)

**ANSWER:** Coventry denies the allegations in this Paragraph 103.


104. On October 22, 2009, Dr. Semba informed Maxwell that he was totally disabled and unable to return to work with the CFD, which Dr. Semba attributed to the fact that Maxwell did not undergo disc replacement surgery – the surgery that Coventry had unjustifiably not approved on April 28, 2009 and September 11, 2009. (Exhibits 16 and 17, respectively.)

**ANSWER:** Coventry states that Exhibits 16 and 17 are the best evidence of their terms.

Coventry denies the allegations in this Paragraph to the extent that such allegations are

inconsistent with, misstate or otherwise mischaracterize Exhibits 16 and 17. Coventry denies

any implication of wrongdoing related to Exhibits 16 and 17. Coventry states that it lacks

sufficient information or knowledge regarding the allegations contained in this Paragraph in

order to verify the truth or falsity of such allegations and therefore, denies such allegations.


105. When his 12 months of layup time with the CFD expired on December 11, 2009, and with Maxwell physically and medically unable to return to work, Maxwell applied for, and received, a duty disability pension from the Firemen's Annuity and Benefit Fund of Chicago.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding

the allegations in this Paragraph in order to verify the truth or falsity of such allegations and

therefore, denies such allegations.


106. The Medical Care prescribed by Drs. Semba, Jain, and Mikhail, as Maxwell's referral treating physicians, was consistent with generally accepted medical standards within the Chicago area medical community.

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

107.    Maxwell's inability to return to work is a direct and proximate result of Coventry's tortious interference with the contractual rights conferred by § 7.3 of the CBA (as more fully alleged in Counts I, II and III of this Complaint), causing Maxwell to incur damages in the form of lost wages, compensation, and benefits, as well as career advancement, including promotions. Maxwell has also experienced pain, suffering, loss of a normal life, disability, emotional trauma, anguish, anxiety, worry, indignity, embarrassment, apprehension, aggravation, and he has undergone an ordeal over and above that which he would otherwise have experienced from the original duty related-injury he sustained on or about December 12, 2008. Plaintiff Steven Maxwell's damages exceed $50.000.00.

**ANSWER:** Coventry denies the allegations in this Paragraph 107.

COUNT I

Allegations of Tortious Interference with Contract

(i) Plaintiffs are Third Party Beneficiaries of § 7.3 of the Collective Bargaining Agreements between the City and Local No. 2

108.    Plaintiffs re-allege and incorporate by reference the allegations of ¶¶ 1-107 of this Complaint.

**ANSWER:** Coventry incorporates by reference its answers to the allegations contained in Paragraphs 1 through 107 of the Plaintiffs' Complaint as and for Coventry's answer to this Paragraph.

109.    For at least the last 30 years, and during all times material to the allegations of this Complaint, each CBA entered into between the City and Local No. 2, has been adopted by the Chicago City Council in ordinance form pursuant to the City's Home Rule authority. (Exhibit 2; CBA § 20.3.) Throughout this period § 7.3 has been incorporated in each CBA *qua* ordinance, including the last paragraph: "The Employer further agrees to pay all hospital and medical costs of an employee incurring a duty connected injury, illness or disability." (emphasis added)

**ANSWER:** Coventry states that it lacks sufficient information or knowledge regarding the allegations in this Paragraph in order to verify the truth or falsity of such allegations and therefore, denies such allegations.

110. Each of the six plaintiffs is a third party beneficiary of certain terms of the CBA, including § 7.3. The six named plaintiffs seek to recover monetary damages against Coventry, because the damages incurred by the six named plaintiffs have been caused, in whole or in part, by Coventry's tortious interference with contractual rights, including interference with the rights conferred by CBA § 7.3.

**ANSWER:** Coventry states that the allegations in the first sentence of this Paragraph set forth legal conclusions to which no answer is required and, therefore, Coventry denies such allegations. Coventry admits that the six named Plaintiffs purport to be seeking monetary damages from Coventry, but Coventry denies that it has engaged any wrongdoing as against the Plaintiffs and denies that any of the Plaintiffs are entitled to recover any damages. Coventry denies that it has tortiously interfered with the Plaintiffs' contractual rights. Coventry denies the remaining allegations of this Paragraph.

(ii) Coventry's Knowledge of the CBA between the City and Local No. 2

111. Prior and at all times subsequent to November 20, 2008, the date that the City and Coventry became signatories to the Letter Agreement {Ex. 1) – or shortly thereafter – Coventry, by and through officers, employees, and agents, including (but not limited to) Senior Vice President Robert Gelb, knew, understood, acknowledged, recognized and/or believed:

(a) That CFD firefighters and paramedics, like the six plaintiffs herein, were represented for purposes of collective bargaining by Local NO. 2 (Attached hereto as Exhibit 18 is an email dated November 5, 2008, on which Coventry officers Gelb and Wallace were copied, referring, *inter alia,* to the "Union . . . on the . . . fire side," *viz,,* Local No. 2.)

(b) [left blank. No (b) in original]

40

(c) That CFD firefighters and paramedics who sustained duty related-injuries of the types sustained by the six plaintiffs, were excluded from coverage under the Illinois Workers Compensation Act;

(d) That CFD firefighters and paramedics who sustained duty related injuries were entitled to Medical Care, and that the City had the responsibility to provide Medical Care to duty-injured firefighters and paramedics, with all costs for such care borne by the City;

(e) That group health insurance plans administered on behalf of the City does not pay for Medical Care incurred for the treatment of duty-related injuries like those suffered by the six plaintiffs; and

(f) That the "Program Overview for City of Chicago UR," dated November 24, 2008, issued by Coventry, states that Coventry's "evaluation of medical necessity and appropriateness," would be performed "under the provisions of the applicable benefit plan." (Attached hereto and incorporated herein as Exhibit 19 is an excerpt from the Program Overview.")

**ANSWER:** Coventry states that the initial allegation in this Paragraph 111 is internally inconsistent in that it alleges knowledge arising purportedly prior to November 20, 2008 or arising "shortly thereafter" and Coventry accordingly denies the initial allegation in this Paragraph 111. Coventry admits that what appears to be a true and correct copy of an email dated on or around November 5, 2008 is attached as Exhibit 18 to the Complaint. Coventry states that the email that was attached as Exhibit 18 is the best evidence of its terms, and denies the remainder of the allegations in this Paragraph 111 to the extent that they are inconsistent with, mischaracterize or inaccurately summarize, the email. Coventry denies any allegation or implication of wrongdoing associated with the email. Coventry states that Plaintiffs failed to include any allegations as Paragraph 111(b) of their Complaint. To the extent that any response is still required in connection with Paragraph 100(b), Coventry denies Paragraph 111(b). Coventry states that the allegations in Paragraph 111(c) set forth legal conclusions to which no answer is required and, therefore, Coventry denies such allegations. Coventry states that it lacks sufficient information or knowledge regarding the allegations contained in Paragraph 111(e) in

order to verify the truth or falsity of such allegations and therefore, denies such allegations.

Coventry admits that what appears to be a true and correct copy of an excerpt of the Program

Overview is attached as Exhibit 19 to the Complaint. Coventry states that the excerpt that was

attached as Exhibit 19 is the best evidence of its terms, and denies the remainder of the

allegations in this Paragraph 111 to the extent that they are inconsistent with, mischaracterize or

inaccurately summarize, the Program Overview. Coventry denies the remaining allegations that

are contained in this Paragraph 111.

112.    Based on the facts and circumstances addressed herein, Coventry knew of the
City's relationship with a Union that represented CFD firefighters and paramedics, Coventry
knew of the City's responsibility and obligation to provide Medical Care for duty injured CFD
firefighters and paramedics represented by the Union, Coventry knew that the City had to bear
the entire cost of Medical Care, and Coventry further knew that the City's obligation to duty-
injured firefighters and paramedics derived from a collective bargaining agreement between the
City and the Union, and that CFD firefighters and paramedics are solely depend upon the
provisions of the CBA for obtaining Medical Care for duty-related injuries they sustain.

     **ANSWER:**  Coventry denies the allegations in this Paragraph 112.

113.    Based on facts and circumstances addressed herein, and in connection with its
undertaking or anticipated undertaking to provide managed care and utilization review services
for the City with respect to duty-injured CFD firefighters and paramedics, Coventry and its
physicians knew:

     (a)  that the duties of firefighters and paramedics (including CFD firefighters and
paramedics) are rated at the "very heavy category of work," by the U. S.
Department of Labor;

     (b)  that CFD firefighters and paramedics have a comparatively high risk of injury
on the job and that they are especially susceptible – compared to other employee
groups – to suffer work-related musculoskeletal injuries;

     (c)  the Union and the City were parties to a CBA (Ex. 2);

     (d)  that the City was responsible for providing and paying for all medical services
for duty-injured firefighters and paramedics;

(e) that the CFD was the only City department (other than the Chicago Police Department), with a medical section staffed by a physician known as the medical director who monitored duty-related injuries and made referrals of duty-injured firefighters and paramedics to medical specialists (known herein as "referral treating physicians"); and

(f) that medical necessity determinations relating to the Medical Care of duty-injured firefighters and paramedics were made by Dr. Hugh Russell (who during times material to the allegations of this Complaint was the CFD Medical Director), who would heed the advice and recommendations prescribed by a referral treating physician – described in ¶¶ 10, 12-13, *supra* – such advice and recommendations were consistent with generally accepted medical standards within the Chicago area medical community.

**ANSWER:** Coventry denies the allegations in this Paragraph 113.


(iii) Coventry's intentional and unjustified inducement of breach by the City

(B) Coventry's Use and Application of the Official Disability Guidelines

114. In addition to the facts stated in this Complaint, the criteria that Coventry uses in arriving at "not medically necessary" determinations, namely, the ODG, interfered with plaintiffs' rights under CBA § 7.3, because ODG are worker's compensation oriented criteria, though Coventry knew that CFD firefighters and paramedics were not subject to Illinois Worker Compensation laws. Coventry's intentional and medically unjustified application of the inapposite criteria, *i.e.,* Illinois worker's compensation laws and ODG, caused, contributed, and induced the City to breach CBA § 7.3, by denying, delaying, curtailing, discontinuing and/or deferring the delivery of Medical Care that had been prescribed by plaintiffs' referral treating physicians. Coventry's utilization of ODG criteria with respect to duty-injured CFD firefighters and paramedics was unjustified because Coventry knew that:

(a) ODG criteria, other managed care, utilization review, cost containment or so-called evidence based medical criteria or guidelines, are not incorporated in, endorsed by, sanctioned by, or referred to when determining medical necessity in the field of Orthopedic Surgery (Emphasis added.)

(b) Imposition of ODG criteria in place of a CBA, obligation to provide care and pay for that care in the State of Illinois, was a violation of § 15 of the Illinois Labor Relations Act, 5 ILCS 315/15, because "any collective bargaining contract between a public employer and a labor organization executed pursuant to [the ILRA] shall supersede any contrary statutes, charters, ordinances, rules or regulations relating to wages, hours and conditions of employment and employment relations adopted by the public employer or its agents."

(c)  ODG criteria are based on generalities that are assumed to hold true "on average," and are not designed to diagnose and treat a specific patient;

(d)  ODG criteria do not accommodate natural variations among individual patients;

(e)  ODG criteria are based on the assumption that the only effective course of treatment is the one that ODG prescribes; notwithstanding the fact that other clinical practice criteria and guidelines conflict with ODG criteria with respect to the treatment of musculoskeletal conditions;

(f)  ODG criteria do not include a disclaimer, nor did Coventry communicate any such disclaimer to the City or referral treating physicians, to the effect that the guidelines are not intended to be used as a fixed protocol, due to the fact that some patients may require more or less treatment or different means of diagnosis;

(g)  ODG criteria were developed by the Work Loss Data Institute an organization whose interests are aligned with its clientele, namely, employers, insurance companies, and third party administrators (including managed care and utilization review organizations); and

(h)  ODG criteria and/or Coventry's application of those criteria have been based on actuarial cost-benefit assessments, with quality of care and patient recovery subordinate to those financial measures.

**ANSWER:**  Coventry denies the allegations in this Paragraph 114.


115.    Coventry's intentional and unjustified application of the ODG criteria – inapposite and therefore medically unjustified for the reasons set forth in this Complaint caused and/or contributed to the denial, delay, curtailment, discontinuation and/or deferral of the delivery of Medical Care that had been prescribed by plaintiffs' referral treating physicians, and Coventry thereby induced the City's breach of CBA § 7.3.

**ANSWER:**  Coventry denies the allegations in this paragraph 115.


116.    Neither the Letter Agreement between Coventry and the City of November 20, 2008 (Ex. 1), nor Coventry's promulgated materials such as the Program Manual for City of - Chicago Utilization Review, the City of Chicago Utilization Review Workflow, the Program Overview for City of Chicago, nor the not medically necessary determinations, *i.e.,* denial letters from Coventry associated physicians that were transmitted to the CFD Medical Section (such as Exhibits 4, 6, 9, 10, 12-15), included any notification, statement or acknowledgment to the effect that the final decision for the course and type of treatment for each duty injured CFD firefighter and paramedic was a determination to be left to the CFD Medical Director and/or the referral

treating physician in conjunction with the application of their professional medical judgment. On the contrary, the denial letters Coventry transmitted to the CFD Medical Section advised that disagreements with treatment denials had to utilize Coventry's appeal process. *(See, ¶ 120, infra.)*

**ANSWER:** Coventry states that the documents that are attached as Exhibits 4, 6, 9, 10, 12-15 are the best evidence of their terms, and denies the allegations in this Paragraph 116 to the extent that such allegations are inconsistent with, mischaracterize or inaccurately quote or summarize, these documents. Coventry denies any allegation or implication of wrongdoing associated with these documents. Coventry denies the remaining allegations that are contained in this Paragraph.

117. The exclusion by Coventry of the notification, statement or acknowledgment of the type described in ¶ 116, caused and/or contributed to the denial, delay, curtailment, discontinuation and/or deferral of the delivery of Medical Care that had been prescribed by plaintiffs' referral treating physicians, and Coventry thereby induced the City's breach of CBA § 7.3.

**ANSWER:** Coventry denies the allegations in this Paragraph 117.

118. Part IIID1 of the Letter Agreement between the City and Coventry (Ex. 1 at p. 3), left it to Coventry to notify duty-injured employees and their medical providers of Coventry's not medically necessary determinations.

**ANSWER:** Coventry states that the Letter Agreement is the best evidence of its terms and denies the remainder of the allegations in this Paragraph 118 to the extent that such allegations are inconsistent with, or inaccurately summarize, the Letter Agreement. Coventry denies any allegation or implication of wrongdoing associated with the Letter Agreement. Coventry denies the remaining allegations that are contained in this Paragraph.

119. On or about February 23, 2009, Coventry issued instructions to the City (by way of an e-mail message to the Committee on Finance [COF]), that with respect to not medically necessary determinations pertaining, *inter alia,* to duty-injured firefighters and para-medics, that only the CFD Medical Section was to be notified of those determinations *(i.e.,* Coventry's denial

of treatment letters). Neither the duty injured firefighter or paramedic, nor the latter's referral treating physician (or other medical provider), nor any attorney, was to be notified of Coventry's denial of treatment letters. (Attached hereto and incorporated herein as Exhibit 20 is the email dated 2/23/2009, from Coventry's Utilization and Review Supervisor Nikko Farmer to the COF's Director of Workers' Compensation, Ellen Bell.)

**ANSWER:** Coventry admits that what appears to be a true and correct copy of part of an

email chain dated on or around February 23, 2009 between Nikko Farmer and Ellen Bell is

attached to the Complaint as Exhibit 20. Coventry states that the email chain is the best evidence

of its terms, and denies the remainder of the allegations in this Paragraph 119 to the extent that

they are inconsistent with, mischaracterize, and inaccurately quote or summarize, the email

chain. Coventry denies any allegation or implication of wrongdoing associated with the email

chain. Coventry denies that the email chain reflects that Coventry was "issu[ing] instructions to

the City." Coventry denies that it issued "denial of treatment letters." Coventry denies the

remaining allegations that are contained in this Paragraph.


120.    The not medically necessary determination letters pertaining to the six plaintiffs, which Coventry transmitted to the CFD Medical Section (*e.g.,* Exhibits 4, 6, 9, 10, 12, 13, 14, 16 17), included a statement to the effect that "if you do not agree with this review determination, you may request an appeal of this adverse determination in writing within 30 days . . . [and the appeal] will be referred to a board certified Specialty Advisor for Coventry Workers' Comp Services." Given Coventry's notification that the CFD Medical Section could invoke Coventry's internal appeal procedures, and by withholding not medically necessary determination letters (which contained the appeal notice) from duty-injured firefighters and paramedics as well as from referral treating physicians, Coventry caused the CFD Medical Director to be dispelled of any notion or belief that he may have held that as Medical Director he had the authority to reject or to ignore Coventry's not medically necessary determinations (*i.e.,* treatment denial letters).

**ANSWER:** Coventry states that the letters that are attached as Exhibits 4, 6, 9, 10, 12,

13, 14, 16, and 17 are the best evidence of their terms, and denies the allegations in this

Paragraph 120 to the extent that such allegations are inconsistent with, mischaracterize or

inaccurately quote or summarize, the letters. Coventry denies any allegation or implication of

wrongdoing associated with the letters. Coventry denies that it took action to suggest to the CFD

Medical Director that he did not have authority to ignore or reject Coventry's recommendations. Coventry states that it lacks sufficient information or knowledge regarding the allegations in this paragraph regarding the CFD Medical Director's purported "notion or belief" in order to verify the truth or falsity of such allegations and therefore, denies such allegations. Coventry denies the remaining allegations that are contained in this Paragraph.

121.    The circumstances alleged in this Subparagraph B, including Coventry's baseless and unjustified "not medically necessary determinations" caused, contributed and induced the City to breach CBA § 7.3, resulting in the denial, delay, curtailment, discontinuation and/or deferral of the delivery of Medical Care that had been prescribed by plaintiffs' referral treating physicians.

**ANSWER:**  Coventry denies the allegations in this Paragraph 121.

122.    Withholding notifications of its not medically necessary determination letters from duty-injured firefighters and paramedics and from the latter's referral treating physicians (or other medical providers), and with instructions to the City to also withhold such notifications to duty injured firefighters and paramedics, as well as from the latter's referral treating physicians, was a stratagem by which Coventry sought to induce the City to breach CBA § 7.3, and in so doing Coventry violated or subverted the Managed Care Reform and Patient Rights Act, 215 ILCS 134/1, and § 35(b) in particular, which provides as follows:

> (b) It is the public policy of the State of Illinois that a physician or any other health care provider be encouraged to advocate for medically appropriate health care services for his or her patients. "[T]o advocate for medically appropriate health care services" means to appeal a decision to deny payment for a health care service pursuant to the reasonable grievance or appeal procedure established by a health care plan or to protest a decision, policy, or practice that the physician or other health care provider, consistent with that degree of learning and skill ordinarily possessed by physicians or other health care providers practicing in the same or a similar locality and under similar circumstances, reasonably believes impairs the physician's or other health care provider's ability to provide appropriate health care services to his or her patients.

**ANSWER:**  Coventry denies the allegations in this Paragraph 122.

**WHEREFORE**, for all of the reasons set forth above, Coventry respectfully requests that this Court enter an Order:

A.     Awarding judgment in its favor and against Plaintiffs and dismissing the
       Complaint with prejudice;

B.     Awarding Coventry its costs that were incurred in connection with defending this
       suit; and

C.     Awarding Coventry such other and further relief as this Court deems just and
       proper.


## COUNT II

123.    Plaintiffs re-allege and incorporate by reference the allegations of ¶¶ 1-122 of this
Complaint.

**ANSWER:**  Coventry incorporates by reference its answers to the allegations contained

in Paragraphs 1 through 122 of the Plaintiffs' Complaint as and for Coventry's answer to this

Paragraph.


124.    The Letter Agreement between Coventry and the City of Chicago (Ex. 1),
provides *inter alia,* that Coventry will perform managed care and utilization review services for
the City in connection with employees who are "occupationally ill or injured," and are "entitled
to benefits under the Workers' Compensation Act."

**ANSWER:**  Coventry admits that what appears to be a redacted copy of the Letter

Agreement between Coventry and the City is attached as Exhibit 1 to the Complaint, states that

the Letter Agreement is the best evidence of its terms, and denies the remainder of the

allegations in this Paragraph 124 to the extent that they are inconsistent with, or inaccurately

quote or summarize, the Letter Agreement.  Coventry denies any allegation or implication of

wrongdoing associated with the Letter Agreement.  Coventry denies the remaining allegations

that are contained in this Paragraph.

125.    Coventry knew that CFD firefighters and paramedics are not covered by the Workers' Compensation Act. This knowledge was acquired by Coventry representatives before November 20, 2008, the effective date of the Letter Agreement.

**ANSWER:**  Coventry states that the allegations in this Paragraph set forth legal

conclusions to which no answer is required and, therefore, Coventry denies such allegations.

126.    Without any subsequent "mutual' written agreement between the parties," as required by Part III(E) of the. Letter Agreement (Exhibit 1 at page 5), Coventry, nevertheless, extended its managed care and utilization review services to duty injured CFD firefighters and paramedics.

**ANSWER:**  Coventry states that the Letter Agreement is the best evidence of its terms

and denies the remainder of the allegations in this Paragraph 126 to the extent that they are

inconsistent with, or inaccurately summarize, the Letter Agreement itself.  Coventry admits that

it provided utilization review services to CFD firefighters and paramedics.  Coventry denies any

allegation or implication of wrongdoing associated with the Letter Agreement.  Coventry denies

the remaining allegations that are contained in this Paragraph.

127.    Coventry's baseless and unjustified "not medically necessary determinations," arising from Coventry's extra-contractual application of managed care and utilization review processes and methods to duty-injured CH) firefighters and paramedics, including the six plaintiffs, caused, contributed and induced the City to breach CBA § 7.3, resulting in the denial, delay, curtailment, discontinuation and/or deferral of the delivery of Medical Care that had been

**ANSWER:**  Coventry denies the allegations that are contained in Paragraph 127.

**WHEREFORE**, for all of the reasons set forth above, Coventry respectfully requests that

this Court enter an Order:

A.    Awarding judgment in its favor and against Plaintiffs and dismissing the Complaint with prejudice;

B.    Awarding Coventry its costs that were incurred in connection with defending this suit; and

C.      Awarding Coventry such other and further relief as this Court deems just and proper.

## COUNT III

128.    Plaintiffs re-allege and incorporate by reference the allegations of in ¶¶ 1-127 of this Complaint.

**ANSWER:** Coventry incorporates by reference its answers to the allegations contained in Paragraphs 1 through 127 of the Plaintiffs' Complaint as and for Coventry's answer to this Paragraph.

129.    In the alternative, and assuming *arguendo,* that duty-injured CFD firefighters and paramedic were to be included under the Letter Agreement between Coventry and the City, Coventry still was without authority, and lacked any privilege, right or interest, to apply managed care and utilization review processes and methods (including ODG criteria) to duty-injured CFD firefighter's and paramedics.

**ANSWER:** Coventry denies the allegations that are contained in Paragraph 129.

130.    Coventry's parsimony, by rationing Medical Care for duty injured CFD fire-fighters and paramedics, complemented Coventry's self-proclaimed standing as the cost contain-ment leader among managed care organizations (*see ¶¶* 8, *supra),* and was achieved at the expense of the Medical Care and recovery of duty injured CFD firefighters and paramedics through the use of inapposite ODGs.

**ANSWER:** Coventry denies the allegations that are contained in Paragraph 130.

131.    Coventry's interest in rationing the Medical Care of duty injured CFD firefighters and paramedics is the antithesis of well-defined public policies in the State of Illinois – and the City of Chicago in particular:

(a) "Favoring a safe and effective fire prevention system." *Chicago Fire Fighters Union Local No. 2 v. City of Chicago,* 323 Ill. App.3d 168, 751 N.E.2d 1169, 1174 (1st Dist. 2001). This public policy cannot be fulfilled without the guarantee, as set forth in CBA § 7.3, that duty-injured CFD firefighters and paramedics will receive prompt medical treatment prescribed by referral treating physicians –

appointed by the CFD Medical Section – so as to facilitate their rehabilitation, speedy recovery, and return to active duty CFD.

(b) Providing that public safety employees within Illinois, CFD firefighters and paramedics included, who suffer catastrophic injuries in the course of a [r]esponse to what is reasonably believed to be an emergency," are – along with their spouse and eligible children – entitled to premium free health insurance, an obligation that is the public employer's to bear for as long as the injury prevents the return to active duty: Public Safety Employee Benefits Act ("PSEBA"), 820 ILCS 320/10.

**ANSWER:** Coventry states that 323 Ill. App. 3d 168 and 820 ILCS 320/10 are the best evidence of their terms, and Coventry denies the allegations in this Paragraph to the extent that such allegations are inconsistent with, misstate, or otherwise incorrectly summarize the plain language of 323 Ill. App. 3d 168 and 820 ILCS 320/10. Answering further, Coventry states that the allegations in this Paragraph set forth legal conclusions to which no answer is required and, therefore, Coventry denies such allegations. To the extent that any of the allegations in this Paragraph 131 are not a legal conclusion, Coventry denies the allegations in this Paragraph.

132. The public interest of Illinois favors the initiation of prompt Medical Care to duty-injured CFD firefighters and paramedics, and to continue with the provision of that Medical Care, so long as that Medical Care satisfies generally accepted medical standards within the Chicago area medical community, as determined by the CFD Medical Director and referral treating physicians.

**ANSWER:** Coventry states that the allegations in this Paragraph set forth legal conclusions to which no answer is required and, therefore, Coventry denies such allegations. To the extent that the allegations in this Paragraph 132 are not a legal conclusion, Coventry denies the allegations in this Paragraph.

133. The right to Medical Care for duty-injured firefighters and paramedics is a contractual right under CBA § 7.3, and has the imprimatur of State law and public policy. Consequently, plaintiffs' interests to received Medical Care is an interest of far greater value than Coventry's revenues and its cost containment measures, achieved only through the application of inapposite managed care and utilization review processes, including ODG criteria.

**ANSWER:** Coventry states that the allegations in the first sentence of this Paragraph set forth legal conclusions to which no answer is required and, therefore, Coventry denies such allegations. Coventry denies the allegations that are contained in the second sentence of Paragraph 133.

134. Because plaintiffs' contractual rights arc of greater value than Coventry's interests, Coventry's tortious interference with CBA § 7.3, was intentional and medically unjustified.

**ANSWER:** Coventry denies the allegations that are contained in Paragraph 134.

**WHEREFORE**, for all of the reasons set forth above, Coventry respectfully requests that this Court enter an Order:

A. Awarding judgment in its favor and against Plaintiffs and dismissing the Complaint with prejudice;

B. Awarding Coventry its costs that were incurred in connection with defending this suit; and

C. Awarding Coventry such other and further relief as this Court deems just and proper.

## AFFIRMATIVE DEFENSES

As separate and distinct affirmative defenses to Plaintiffs' Complaint and alleged causes of action, and each of them, Coventry alleges as follows:

### First Affirmative Defense
### (Failure to Name Correct Corporate Defendant)

1. Coventry Health Care was merged with Aetna Health Holdings, LLC effective as of January 1, 2014, and Coventry Health Care is no longer a separate entity that can be subject to Plaintiffs' claims. Accordingly, Plaintiffs' claims against Coventry Health Care are barred.

**Second Affirmative Defense**
**(Statute of Limitations)**

2.      Any claims that Plaintiffs could bring against Aetna Health Holdings, LLC and/or

Aetna Inc. are barred by the statute of limitations.

**Third Affirmative Defense**
**(Failure to State a Cause of Action)**

3.      As a separate, affirmative defense, each of the Plaintiffs has failed to state a cause

of action upon which relief may be granted.

**Fourth Affirmative Defense**
**(Failure to Exhaust Administrative Remedies)**

4.      As a separate, affirmative defense, each of the individual Plaintiffs has failed to

exhaust his or her administrative remedies and, accordingly, each of the individual Plaintiffs'

claims is barred.

**Fifth Affirmative Defense**
**(Privilege/Justification)**

5.      As a separate, affirmative defense, Coventry alleges that its conduct was privileged

and/or justified, and accordingly, Plaintiffs' claims in the Complaint are barred.

**Sixth Affirmative Defense**
**(Consultant's Privilege)**

6.      As a separate, affirmative defense, Coventry alleges that its conduct was protected

by the consultant's privilege, which is applicable to all of Coventry's alleged conduct and serves

as a complete bar to Plaintiffs' claims in the Complaint.

**Seventh Affirmative Defense**
**(Failure to Mitigate)**

7.      As a separate, affirmative defense, each of the individual Plaintiffs has failed to

exercise reasonable diligence to mitigate his or her harm/damages (if any were in fact suffered,

which is expressly denied) and, therefore, each of the individual Plaintiffs is barred from recovering any damages (or any damages awarded should be reduced accordingly).

## Eighth Affirmative Defense
### (Acts of Other Parties)

8. As a separate, affirmative defense, if Plaintiffs suffered any harm/damages (which is expressly denied), said harm/damages was proximately caused by the acts of third parties, including, but not limited to, the City of Chicago.

## Ninth Affirmative Defense
### (Plaintiffs' Own Acts)

9. As a separate, affirmative defense, if Plaintiffs suffered any harm/damages (which is expressly denied), said harm/damages was proximately caused by the Plaintiffs' own acts and, therefore, Coventry should not be held responsible for any such harm/damages.

## Tenth Affirmative Defense
### (Good Faith)

10. As a separate, affirmative defense, Coventry acted reasonably, lawfully, and in good faith at all times material herein based on all relevant facts and circumstances known to it.

## Eleventh Affirmative Defense
### (Conduct Permitted By Contract)

11. As a separate, affirmative defense, Coventry alleges that any purportedly wrongful conduct that is alleged in the Complaint was performed in accordance with, and in order to fulfill Coventry Health Care's obligations pursuant to its contractual relationship with the City of Chicago.

## Twelfth Affirmative Defense
### (Nonexistent Obligations)

12. As a separate, affirmative defense, Coventry alleges that the Complaint is predicated on nonexistent obligations, which were not contracted for and are outside the scope of any agreement between the City of Chicago and the Plaintiffs.

**Thirteenth Affirmative Defense**
**(Unjust Enrichment)**

13. As a separate, affirmative defense, Plaintiffs' Complaint is barred by the doctrine of unjust enrichment.

**Fourteenth Affirmative Defense**
**(Waiver)**

14. As a separate, affirmative defense, Plaintiffs' claims are barred by the doctrine of waiver.

**Fifteenth Affirmative Defense**
**(Estoppel)**

15. As a separate, affirmative defense, Plaintiffs' claims are barred by the doctrine of estoppel.

**Sixteenth Affirmative Defense**
**(Laches)**

16. As a separate, affirmative defense, Plaintiffs' claims are barred by the doctrine of laches.

**Seventeenth Affirmative Defense**
**(Unclean Hands)**

17. As a separate, affirmative defense, Plaintiffs' claims are barred by the doctrine of unclean hands.

**Eighteenth Affirmative Defense**
**(Statute of Limitations)**

18. Plaintiffs' claims against Coventry HealthCare are barred by the statute of limitations.

## Nineteenth Affirmative Defense
### (Excuse)

19. As a separate, affirmative defense, Coventry asserts that any alleged breach or improper conduct that is alleged to have occurred on the part of Coventry is excused by the Plaintiffs' own acts and/or omissions.

Coventry reserves the right to amend or add additional affirmative defenses and claims that may later become known.

**WHEREFORE**, for all of the reasons set forth above, Coventry respectfully requests that this Court enter an Order:

A. Awarding judgment in its favor and against plaintiffs and dismissing the Complaint with prejudice;

B. Awarding Coventry its costs that were incurred in connection with defending this suit; and

C. Awarding Coventry such other and further relief as this Court deems just and proper.


Dated: April 3, 2017                    _____/s/_____Jeffrey C. Clark_____
                                        One of the Attorneys for Defendant

                                        **MCGUIREWOODS LLP**

                                        Jeffrey C. Clark
                                        jclark@mcguirewoods.com
                                        David J. Pivnick
                                        dpivnick@mcguirewoods.com
                                        77 W. Wacker, Dr., Ste. 4100
                                        Chicago, IL 60601
                                        P: 312-750-3585
                                        F: 312-698-4539

## CERTIFICATE OF SERVICE

I, Jeffrey C. Clark, an attorney, hereby certify that on April 3, 2017, I caused a copy of the foregoing Coventry Health Care, Inc. and Aetna Health Holdings, LLC's Answer to Plaintiffs' Complaint to be served via United States Mail, first class postage prepaid, and email upon the following people:

Stephen B. Horwitz
Hogan Marren Babbo & Rose, LTD
321 N. Clark St., Ste. 1301
Chicago, Illinois 60654
312-629-2920
sbh@hmbr.com

Mark A. Brown
Lane & Lane, LLC
230 W. Monroe St., Ste. 1900
Chicago, Illinois 60606
312-332-1400
markbrown@lane-lane.com

 

 

_____

Jeffrey C. Clark